IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KURTIS T. WIEMERS, | ) | |
| | ) | 4:11CV3228 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER ON |
| | ) | REVIEW OF THE FINAL DECISION |
| MICHAEL J. ASTRUE, | ) | OF THE COMMISSIONER OF THE |
| Commissioner of Social Security | ) | SOCIAL SECURITY |
| Administration, | ) | ADMINISTRATION |
| | ) | |
| Defendant. | ) | |

On December 17, 2011, the plaintiff, Kurtis T. Wiemers, filed a complaint against the defendant, Michael J. Astrue, Commissioner of the Social Security Administration. (ECF No. 1.) Wiemers seeks a review of the Commissioner's decision to deny his applications for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. See 42 U.S.C. §§ 405(g) and 1383(c)(3) (providing for judicial review of the Commissioner's final decisions under Titles II and XVI of the Act). The Commissioner has filed an answer to the complaint and a transcript of the administrative record. (See ECF Nos. 10-13.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., ECF No. 17; Def.'s Br., ECF No. 20; Pl.'s Reply Br., ECF No. 21.) I have carefully reviewed these materials, and I find that the Commissioner's decision must be affirmed.

1

## I.   BACKGROUND

On June 30, 2009, Wiemers filed applications for disability insurance benefits and SSI benefits.  (Transcript of Social Security Proceedings (hereinafter "Tr.") at 103-109.)  The applications were denied on initial review, (id. at 43-44, 47-51), and on reconsideration, (id. at 45-46, 57-61).  Wiemers then requested a hearing before an ALJ.  (Id. at 62-64.)  The hearing was held on March 1, 2011, (e.g., id. at 22), and, in a decision dated July 8, 2011, the ALJ concluded that Wiemers was "not disabled under sections 216(i) and 223(d) of the Social Security Act," (id. at 21; see also id. at 7-21).  Wiemers requested that the Appeals Council of the Social Security Administration review the ALJ's decision.  (See id. at 4.)  This request was denied, (see id. at 1-3), and therefore the ALJ's decision stands as the final decision of the Commissioner.

## II.   SUMMARY OF THE RECORD

On a Disability Report form, Wiemers claimed that he became disabled on September 10, 2007, due to bipolar disorder, anxiety disorder, depression, "rt shoulder post-surgery," "herniated disc neck-post surgery but with chronic pain due to pinched nerve," seizures, headaches, allergies, "hbp," and "bleeding ulcers."  (Tr. at 165.)  He later amended his alleged onset date to March 2009 and attributed his most significant limitations to his seizures, anxiety, and bipolar disorder.  (Id. at 25-26.)  Wiemers was born in August 1971.  (Id. at 159.)  He completed two years of college education, (id. at 172), and he has work experience as a cashier, framing carpenter, pallet builder, stocker, and truck driver, (id. at 166).

2

## A.   Medical Evidence[1]

On October 27, 1998, S. E. Strasburger, M.D., performed arthroscopic surgery on Wiemers' right shoulder.  (E.g., Tr. at 250.)  Wiemers tolerated the procedure well, and no complications were identified.  (Id. at 252.)

Wiemers reports that he was diagnosed with bipolar disorder in 2003 or 2004, (id. at 379), and medical records include references to the diagnosis as early as January 12, 2007, (id. at 303).  Wiemers also reports that he began suffering from anxiety after he finished high school.  (Id. at 379.)

On March 12, 2009, Wiemers was transported to the Beatrice Community Hospital and Health Center (Beatrice Community Hospital) after suffering a seizure while talking on the telephone.  (Id. at 261.)  The seizure was witnessed by Wiemers' wife.  (Id.)  Wiemers had no prior history of seizures, and "no seizure activity [was] noted" during his examination.  (Id. at 262, 264.)  His physician's impression was that Wiemers suffered a "syncopal spell" and "possible seizure," and Wiemers was discharged home in good condition.  (Id. at 262.)

Wiemers returned to the Beatrice Community Hospital on June 24, 2009, after suffering another seizure.  (Id. at 449-50.)  The records indicate that Wiemers woke up in a chair after having cut the tip of his tongue with his teeth.  (Id. at 449.)  A CT scan of Wiemers' head was negative, and he was discharged home with instructions not to drive and to see "J. Bock tomorrow."  (Id. ¶ 450.)

A medical record entry indicates that Wiemers and his wife visited the New Beginnings Behavioral Health Center in Beatrice, Nebraska, on June 25, 2009.  (Id.

---

[1]  My review of the medical evidence emphasizes the records cited by the parties in their briefs.  (See Pl.'s Br. at 2-7, ECF No. 17; Def.'s Br. at 3-11, ECF No. 20.)

at 417.)  The entry is initialed "JMB," (id.), and based on other documents in the transcript, I infer that "JMB" refers to Janet M. Bock, MSN, APRN.  According to Nurse Bock's entry, Wiemers "had been extremely anxious all day" on the day of his seizure, and the seizure was "associated with high anxiety as exhibited in March of 2009."  (Id.)  She referred Wiemers to a neurologist and told him to refrain from driving until cleared to do so.  (Id.  See also id. at 529.)

John C. Puente, M.D., of Neurology Associates, P.C. in Lincoln, Nebraska, wrote a letter to Nurse Bock dated June 26, 2009.  (Id. at 299.)  Dr. Puente's letter begins as follows:

> [Wiemers] had an episode the other day where he does not recall specifics.  Apparently he was in his house.  His wife called and she noted that he was not himself.  He recalls apparently snapping a Sharpie in his mouth and bit his tongue and somehow made it out to ask his neighbor for help and went to the emergency room.  They documented that he had a seizure, and asked him to see his primary care physician.  His primary care physician referred to neurology.  He is scheduled to start a job where he drives in the near future.

> There is also some concern that he suffered a seizure or syncopal episode a few months ago.  Again, he does not really recall specifics, but his wife said that he did convulse during that episode.  Other than that, he was not noted to have prior seizures.  He does have a history of bipolar disorder and was being treated for that as well as chronic pain in his neck, bleeding ulcer, hypertension, hypercholesterolemia and a prior history of alcohol abuse.

(Id.)  Dr. Puente identified Wiemers' current medications as "Tramadol, Flexeril, hydrochlorothiazide, Atenolol, Carafate, Lorazepam, Omeprazole, multiple vitamin, Seroquel, Pravastatin and fish oil."  (Id.)  He also noted that Wiemers was taking Dilantin.  (Id. at 300.)  Wiemers' neurological exam was normal, but Dr. Puente agreed with the emergency room's diagnosis of seizure, and he stated that he did "not

have enough information to disagree with" the conclusion that Wiemers should not drive for three months. (Id.) Dr. Puente said that an EEG would be obtained "to complete his work up," and Wiemers was directed to follow up in three months. (Id. at 301.) Wiemers' EEG, which was obtained on July 2, 2009, "was suggestive of an underlying seizure diathesis." (Id. at 336; see also id. at 335.)

A record that seems to be from Nurse Bock's office indicates that Wiemers obtained test results and medication refills on July 10, 2009. (Id. at 528.) During this visit, Wiemers was diagnosed with "seizure activity" and allergies, and his medications were refilled. (Id.)

On July 11, 2009, Wiemers completed a "Daily Activities and Symptoms Report" in connection with his applications for Social Security benefits. (Id. at 175-179.) On this report, Wiemers wrote that he can bathe and dress himself, and he usually cooks for his wife and cleans the dishes. (Id. at 175.) He sometimes made the bed, vacuumed floors, and went to church. (Id. at 175-176.) He reported that he suffers from chronic neck and shoulder pain, numbness in his arms, back, and legs, and panic attacks. (Id. at 177.) He also reported that his medication provided some relief. (Id. at 177-178.)

Wiemers visited Nurse Bock on August 4, 2009, and received diagnoses of nausea and anxiety. (Id. at 527.) Though parts of the record are difficult to read, it does indicates that Wiemers was prescribed Tramadol, Lorazepam (for anxiety), Flexeril, and Promethazine (for nausea). (Id.) The record does not note whether Wiemers suffered any recent seizures.

On September 2, 2009, Nurse Bock noted that Wiemers had not suffered a seizure during the past month. (Id. at 418, 421.) Wiemers' diagnoses continued to

be anxiety and nausea, and he was prescribed Lorazepam (for anxiety), Tramadol (for pain), and Promethazine (for nausea).  (Id. at 421.)

Patricia J. Blake, Ph.D., interviewed Wiemers on September 4, 2009, and prepared a "Report of Psychological Evaluation" dated September 9, 2009.  (Id. at 377-381.)   According to Dr. Blake's report, Wiemers reported that his "current anxiety symptoms include 'getting into arguments,' 'blowing things out of proportion,' and 'the littlest things bother me.'" (Id. at 379.)  He reported that he was diagnosed "bipolar" in 2003 or 2004, "but it was 'never really explained' to him." (Id.)  He evidently believed that his bipolar symptoms "include 'attention span' and 'I forget things.'" (Id.)  Also, Wiemers reported having approximately five or six seizures during the past two months.  (Id.)  Dr. Blake noted that Wiemers was cooperative and talkative; his mood was normal; "[h]is ability to receive, organize, analyze, remember, and express information appropriately in a conversational setting appear[ed] to be within normal limits"; his judgment and insight were fair; and "[t]here were no observable signs of tension, anxiety, psychomotor disturbance, or substance abuse."  (Id. at 380.)  She also noted that "[t]here do not appear to be restrictions in activities of daily living or in maintaining social functioning due to mental health issues," but it was "unclear whether there are recurrent episodes of symptom exacerbation when stressed."  (Id.)  In addition, Dr. Blake concluded that Wiemers appeared to have "adequate attention and concentration needed for task completion," appeared to have "adequate recent and remote memory," "appear[ed] to be able to carry out short and simple instructions under ordinary supervision . . . and to relate appropriately to coworkers and supervisors," "appear[ed] able to adapt to changes in the environment," and "appear[ed] able to manage financial benefits." (Id.  See also id. at 377.)  Dr. Blake's diagnoses included "R/O Dysthymic Disorder"

6

and "Seizure activity, by report," and she assigned Wiemers a GAF score of 68.[2]  Dr. Blake concluded that Wiemers "does not meet criteria for either bipolar disorder or an anxiety disorder," and that "[h]is primary reported symptom appears to be irritability." (Id. at 381.)        On September 25, 2009, Glen Knosp, M.D., reviewed the medical record and completed a "Physical Residual Functional Capacity Assessment" form.   (Id. at 403-411.)   Dr. Knosp opined that Wiemers could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry up to ten pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (Id. at 404.) He added that Wiemers could occasionally climb, balance, stoop, kneel, crouch, and crawl, but he could not use "ladders, scaffolds, etc. due to seizure disorder." (Id. at 405.)  In addition, Dr. Knosp opined that Wiemers should avoid concentrated exposure to extreme cold, extreme

---

[2] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" Pate-Fires v. Astrue, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)).  "A GAF of 31 to 40 indicates the individual has an 'impairment in reality testing or communication . . . or [a] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . .'" Id. (quoting DSM-IV at 32).  "A GAF of 41 to 50 indicates the individual has '[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . .'" Id. at 938 n.2 (quoting DSM-IV at 32).  "A GAF of 51 to 60 indicates the individual has '[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . .'" Id. at 938 n.3 (quoting DSM-IV at 32).  A GAF of 61 to 70 indicates that the individual has "[s]ome mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . , but [is] generally functioning pretty well . . . ."  DSM-IV at 32.

heat, vibration, fumes, and hazards.  (Id. at 407.)  After noting that Wiemers' "mental allegations will be evaluated independently," Dr. Knosp commented,

> The claimant's conditions do not meet/equal any Listings.  He has been treated more recently for syncope episodes, apparently seizures.  His allegations of shoulder and neck surgery appear credible, but most of this was done prior to AOD and based on overall evidence do not appear to be the primary reason disability was filed.  His physical exam was unremarkable.  The claimant does appear capable of lighter work activity, but would have additional limitations to hazardous work environments and seizure triggers, as noted on forms.

(Id. at 410.)

Also on September 25, 2009, Christopher Milne, Ph.D., completed a "Psychiatric Review Technique" form.  (Id. at 388-401.)  After reviewing the records, Dr. Milne concluded that Wiemers' only "[m]edically determinable impairment[]" was "Rule out Dysthymic Disorder," which "appears non-severe."  (Id. at 400.)  He added that "there are no significant psychological limitations."  (Id.)

Nurse Bock examined Wiemers on September 30, 2009, diagnosed neck and shoulder pain, and prescribed Lyrica.  (Id. at 525.)  She noted that Wiemers "misses driving," but she did not indicate whether Wiemers had suffered any recent seizures. (Id.)

Sometime during October 2009, Wiemers completed a "Disability Report - Appeal" form.  (Id. at 203-209.)  On this form, Wiemers reported that he suffered "more seizures in August, even more in September."  (Id. at 204.)

Wiemers visited Nurse Bock again on October 29, 2009, for a medication refill. (Id. at 524.)  The record is difficult to read, but it appears to indicate that Wiemers had not suffered any recent seizures.  (Id.)  Nurse Bock diagnosed chronic neck and shoulder pain, and she again prescribed Lyrica.  (Id.)

On a form dated November 6, 2009, Wiemers indicated that he suffers seizures "around once a month or so." (Id. at 210; see also id. at 210-212.) In response to a question asking him to list the dates of the seizures he suffered during the past year, he wrote "Sept. 08 (ER visit)," "March 12, '09 - ER visit, May '09 (x2)," "June '09 (ER visit), Sept '09 (x2)." (Id. at 210.)

Records indicate that Wiemers was driving in early November 2009, but he "blacked out and hit a parked car." (Id. at 418. See also id. at 523.) Nurse Bock concluded that Wiemers' accident was caused by a seizure. (Id. at 523.)

On December 22, 2009, Nurse Bock completed a "Seizures Residual Functional Capacity Questionnaire." (Id. at 432-435.) On this form, Nurse Bock listed Wiemers' diagnoses as "Hypertension; Bipolar Disorder; Hx of alcoholism; Chronic neck [and] back pain; Hx of anemia; Insomnia; Anxiety." (Id. at 432.) She then described his seizures as "tonic/clonic," generalized, and causing a loss of consciousness. (Id.) When asked to assess the frequency of Wiemers' seizures, Nurse Bock described them as "Infrequent" and indicated that she did not know the number of seizures that Wiemer suffered per week or per month. (Id.) She also wrote that Wiemers' last three seizures occurred on March 12, 2009, June 24, 2009, and November 4, 2009, but "others" were "undocumented @ home." (Id.) She stated that the seizures typically last for three minutes and occur without warning, though stress was a precipitating factor. (Id. at 432-433.) She wrote that Wiemers' postictal state lasted for one to two hours and was characterized by confusion, exhaustion, irritability, severe headache, muscle strain, paranoia, anxiety, and disorientation. (Id. at 433.) She added that Wiemers' seizures caused "total disruption" of his daily activities. (Id.) On a line stating, "Type of medication and response," Nurse Bock wrote, "Lorazepam - - good response." (Id.) She also indicated that Wiemers

9

complied with his medication regimen and that his seizure medication caused him no side effects.  (Id. at 433-34.)  Nurse Bock opined that Wiemers' seizures were likely to disrupt the work of co-workers, that Wiemers would need more supervision at work due to his seizures, and that Wiemers cannot work at heights, work with power machines, operate a motor vehicle, or take a bus alone.  (Id. at 434.)  In addition, she opined that Wiemers would sometimes need to take unscheduled ten-minute breaks every two hours during an eight-hour workday, that he was "[i]ncapable of even 'low stress' jobs" due to his anxiety, and that he would be absent from work more than four days per month.  (Id. at 435.)  She indicated that Wiemers' ability to work was affected not only by his seizures and anxiety, but also his chronic neck pain, back pain, and "[f]requent headaches."  (Id.)

On January 19, 2010, Jerry Reed, M.D., reaffirmed Dr. Knosp's physical residual functional capacity assessment of September 25, 2009.  (Id. at 439-440.)  In so doing, he considered Nurse Bock's "Seizures Residual Functional Capacity Questionnaire."  (Id. at 439.)  He wrote,

> The claimants [sic] attorney submitted a generated Seizures RFC Questionnaire from Janet Bock, APRN.  She notes the claimant has tonic/clonic generalized seizures.  The frequency of the seizures is unknown and infrequent but documents a seizure in 3/09, 6/09 and in 11/09.  The claimant reports one seizure a month.  However, review of the MER does not show monthly seizures.  The claimant is judged to be partially credible.

(Id.)  He concluded his comments by stating, "There is no significant change.  Therefore, this is a reaffirmation of his previous physical abilities."  (Id.)

Also on January 19, 2010, Wiemers visited Nurse Bock and denied "seizure activity."  (Id. at 537.)  He also reported that his medications were helping relieve his pain.  (Id.)

10

Wiemers returned to the Beatrice Community Hospital on January 30, 2010, after falling from a stool while suffering a seizure.  (Id. at 445.)  Wiemers was found to have a "Subtherapeutic Dilantin level," and he admitted to missing some doses of his nausea medication.  (Id. at 445-446.)  He was discharged home in stable condition with instructions to follow up with Nurse Bock.  (Id. at 446.)  Records indicate that Wiemers did visit Nurse Bock on February 16, 2010, and reported suffering the seizure.  (Id. at 520.)  Nurse Bock noted that according to Wiemers' wife, he "has extreme anxiety during [the] post-ictal phase of seizure," and his wife was directed to "carry Lorazepam to use sublingually if [Wiemers is] agitated after [a] seizure."  (Id. at 537.)

Wiemers visited Nurse Bock on March 13, 2010, to refill his medications.  (Id. at 519.)  She diagnosed seizure disorder, anxiety, and chronic neck pain.  (Id.)

On April 5, 2010, Wiemers visited Kathryn Hajj, M.D., with complaints of muscle aches, neck pain, and neck stiffness.  (Id. at 604.)  Dr. Hajj wrote, "His musculoskeletal pain is chronic in nature and under control with pain medications.  At this time I have explained that as his weight has increased over time so has his BP.  Medical problems to be addressed today include hypertension.  He does agree to a low dose BP medication."  (Id.)  She also noted, "Review all the current meds and treatment and agree that the pain meds are currently working well and the pain is well controlled. . . . Start Lisinopril . . . and he will begin an exercise program.  He knows not to smoke but both he and his wife will try to stop smoking together."  (Id. at 604-605.)

On April 14, 2010, Wiemers visited Nurse Bock and reported that he suffered seizures on March 24 and April 1.  (Id. at 518.)  He also complained of anxiety and

insomnia.  (Id.)  Nurse Bock made changes to Wiemers' medications (adding Cymbalta) and ordered refills.  (Id.)

Wiemers visited Nurse Bock again on May 12, 2010, with continued complaints of anxiety and insomnia.  (Id. at 517.)  Nurse Bock increased Wiemers' dose of Cymbalta.  (Id. at 517, 537.)  On June 8, 2010, however, she ordered a decrease in Wiemers' Cymbalta and added Seroquel to his regimen.  (Id. at 540, 542.) Wiemers called Nurse Bock on June 16, 2010, and reported that he was sleeping much better since taking Seroquel.  (Id. at 540.)

On July 12, 2010, Wiemers visited Nurse Bock and obtained refills of his Seroquel, Cymbalta, Lorazepam, and Tramadol prescriptions.  (Id. at 541.)  He denied suffering any seizures during the past month.  (Id.)  He reported that he was "contemplating starting to drink again," so Nurse Bock advised him to "get back into A.A. meetings."  (Id. at 540.)

A note from Nurse Bock's clinic dated July 20, 2010, states,

> Notified by Suzanne at Panda pharmacy here in town that pt. was just in there and tried to fill a script for Tramadol #120 from Dr. Hajj in Lincoln but his insurance wouldn't cover it because he had just gotten #120 from us on 7/12, but he said he would pay cash for them, they refused to fill it.  She also had information that Tammy from the Wymore Clinic had contacted Walmart pharmacy about this patient also. At this time Jan would like pt. and his wife to come in for a visit to get their side of this story and why he is seeing other doctors.  Attempted to call wife 2 times and left voicemail for her to call me back ASAP.  Also attempted to call pt. but he did not answer.

(Id. at 540.)  The record states that Wiemers was dismissed from Nurse Bock's clinic on July 27, 2010, "due to multiple doctors and pt. and wife did not attempt to call us back after leaving messages."  (Id.)

Wiemers visited Dr. Hajj on August 16, 2010.  (Id. at 606.)  Dr. Hajj noted,

12

He has been a patient of mine since 4-4-08 and I have been essentially treating him for chronic neck pain and he does require narcotic pain meds.  He had been seeing Dr. Tran prior to my care for about 5 years but the new physician let him go.  I presume it is because he went to see her and got a narcotic prescription but he did not think to tell her that he was routinely under my care and was receiving narcotic medicines.  The patient is here today with his wife and they both have explained that he did not mean to be deceptive in any way. . . .  They both understand clearly that all narcotic medicines especially must be obtained through our office.  Even an emergency room visit if given meds he needs to notify us and he also now knows that.

(Id.)  She also noted that Wiemers had applied for disability and was feeling "very stressed and even depressed from not being able to work at this time."  (Id.)  Dr. Hajj assessed "Fatigue," "Anxiety, generalized," "Neck pain," and "chronic pain," and she recommended that Wiemers "stay under the care of a psychiatrist."  (Id. at 607.)  She also recommended that he "go to Al-Anon for support since he feels so stressed lately."  (Id.)

Dr. Hajj referred Wiemers to Walter J. Duffy, M.D., for medication management, and Dr. Duffy examined Wiemers on September 7, 2010.  (Id. at 559-563.)  Dr. Duffy noted that Wiemers was anxious, fearful, tangential, and "forgetful at times," and he was experiencing "some possible paranoia."  (Id. at 562.)  Dr. Duffy also noted that Wiemers' insight was fair, and his judgment was "[f]air to impulsive."  (Id.)  Wiemers reported that his most recent seizure occurred in April 2010.  (Id. at 561.)  Dr. Duffy diagnosed Wiemers with "Bipolar I, moderate, most recent depressed," Generalized Anxiety Disorder, "Panic disorder w/agoraphobia," Obsessive Compulsive Disorder, and "Alcohol dependence (in full sustained remission)."  (Id. at 559, 562.)  He concluded that Wiemers' GAF score was 50 currently and 52 over the past year.  (Id. at 562.)  Dr. Duffy ordered psychological

testing "with Dr. Tiegs or Carlock looking at mood disorder, anxiety," but he did not order psychotherapy.  (Id.)  Wiemers received prescriptions for Seroquel, Lorazepam, and Lamictal, and he was directed to return for a follow up in two weeks.  (Id. at 562-563.)

Wiemers visited Dr. Duffy again on September 20, 2010.  (Id. at 564.) Wiemers reported that he remained depressed and anxious, adding that he had been taking Lorazepam at least four times per day.  (Id.)[3]  Wiemers' diagnoses and GAF scores remained unchanged, but Dr. Duffy discontinued Wiemers' Lorazepam, added a prescription for Serax, and altered Wiemers' dose of Seroquel.  (Id. at 565.)

On October 4, 2010, Wiemers followed up with Dr. Duffy and reported having a "bad experience" with Dr. Tiegs.  (Id. at 567.)  According to Dr. Duffy's record, "Dr. Tiegs told [Wiemers] he was still drinking, [and] told him he didn't believe him or any of his stories.  Since this encounter he has been worried and stressed. . . . [Wiemers] reports he isn't trying to be a 'jerk' about this but feels he wanted to 'crawl up in a hole and die' after Dr. T called him a 'liar.'"  (Id.)  Dr. Duffy explained to Wiemers that "Dr. Tiegs was not calling him a liar[,] rather the testing came out as not interpretable due to issues as noted in Dr. Tiegs [sic] feedback session note."  (Id.) Wiemers also reported that he was taking more than the prescribed dose of Serax. (Id.)  Dr. Duffy noted that Wiemers remained anxious, irritable, tangential, "forgetful at times," somewhat impulsive, and possibly paranoid.  (Id. at 568.)   Wiemers' diagnoses and GAF score remained the same, and Dr. Duffy adjusted the dosages of Wiemers' medications.  (Id. at 568-569.)

---

[3] Dr. Duffy's records indicate that Wiemers had been directed to take Lorazepam three times per day as needed.  (E.g., Tr. at 562.)

Wiemers and his wife visited Dr. Duffy together on October 27, 2010. (Id. at 570.) Wiemers' wife reported that he was "doing 'not too bad'" and was "more mellow on medicine." (Id.) Wiemers added that he "feels great on his medication," but he admitted to running out of Serax after taking more than the prescribed amount. (Id.) Although his mood had been stable, Wiemers reported that he has feelings of worthlessness, and his "[m]ind races and jumps from topic to topic." No changes were made to Wiemers' diagnoses or GAF score, but adjustments were made to his medication regimen. (Id. at 571-572.)

Wiemers also met with Tom J. Tiegs, Ph.D., on October 27, 2010, for psychological testing. (Id. at 573-584.) Dr. Tiegs noted that "[Wiemers'] response style may indicate a tendency to magnify illness, an inclination to complain, or feelings of extreme vulnerability associated with a current episode of acute turmoil." (Id. at 573.) He added that Wiemers' "scale scores may be somewhat exaggerated," and the test interpretations "should be read with this in mind." (Id.) Based on his testing, Dr. Tiegs concluded that Wiemers "may be assumed" to be "experiencing a severe mental disorder." (Id.) More specifically, he found that Wiemers "appears to fit the following Axis II classifications best: Dependent Personality Disorder, Schizotypal Personality Disorder, and Borderline Personality Disorder, with Avoidant Personality Traits." (Id. at 574.) Also, testing suggested that Wiemers might have the following Axis I syndromes: "Schizoaffective Disorder, Generalized Anxiety Disorder, and Posttraumatic Stress Disorder." (Id.) Dr. Tiegs noted that these syndromes "tend to be relatively transient, waxing and waning in their prominence and intensity depending on the presence of environmental stress." (Id. at 581.)

Wiemers visited Dr. Duffy on November 24, 2010, for a medication check. (Id. at 585.) He reported that he was doing "not too bad," and he believed his medications

15

were working.  (Id.)  He added, however, that he worried "over the little things extensively" and felt "very worthless/hopeless when it comes to paying the bills." (Id.)  Dr. Duffy noted that Wiemers's anxiety was mild, his mood was good, and he was "brighter and less anxious overall."  (Id. at 586.)  Wiemers remained tangential, forgetful at times, and possibly paranoid, however.  (Id.)  Dr. Duffy assigned Wiemers two inconsistent current GAF scores (i.e., 50 and 52).  (Id.)  No changes were made to Wiemers' medications.  (Id.)

Wiemers returned to Dr. Duffy's office for another medication check on December 22, 2010.  (Id. at 588.)  He reported that he had "been taking way too many of the Serax" each day, sometimes double the prescribed amount.  (Id.)  Dr. Duffy noted that Wiemers was "more anxious," and again he assigned inconsistent current GAF scores of 50 and 52.  (Id.)  He counseled Wiemers that his wife must control his medication, and no early refills would be allowed.  (Id. at 588, 590.)

On January 26, 2011, Wiemers was taken to the Beatrice Community Hospital due to "mental status changes over the past 24-36 hours."  (Id. at 543.)  The records indicate that Wiemers was arrested for suspected DUI on January 25 after his car became stuck in snow.  (Id.)  An officer who came to assist Wiemers noted that Wiemers was "acting quite odd, acting confused[,] . . . had some slurred speech and was having trouble keeping his balance."  (Id.)  Because Wiemers' Breathalizer read zero and he had no smell of alcohol, he was suspected of using drugs.  (Id.)  Later that evening, Wiemers appeared to be mostly normal.  When he awoke on the morning of January 26, however, he was confused, lethargic, slurring his speech, and having difficulty balancing.  (Id.)  The hospital record states that Wiemers denied "any drug use or recent dosage changes, although his lamotrigine was increased by Dr. Puente

about 3 weeks ago after he had a seizure on January 8." (Id.)[4]  Wiemers's treating physician conferred with Dr. Duffy, who recommended medication changes.  (Id. at 545.)  Wiemers was discharged on January 27.  (Id.)

On February 16, 2011, Wiemers returned to Dr. Duffy's office for a medication check.  (Id. at 594.)  Dr. Duffy examined Wiemers and again assigned current GAF scores of both 50 and 52.  (Id. at 595.)  He also made slight adjustments to Wiemers' medication regimen and noted that Wiemers' wife kept the medicine in a "lock box." (Id. at 596.)

The record includes a "Health Summary" prepared by Dr. Hajj's office dated March 22, 2011.  (Id. at 610.)  The record states that Wiemers has had a seizure disorder since March 2009, and his last seizure occurred during April 2010.  (Id.)[5]

## B.   Wiemers' Testimony

During the hearing before the ALJ on March 1, 2011, Wiemers testified that since March 2009, he has suffered seizures "usually at least once or twice a month." (Id. at 28.  See also id. at 30.)  He said that he only recorded the dates of the seizures that his wife witnessed, however, which occurred on August 6, 2010; October 12, 2010; December 6, 2010; and January 8, 2011.  (Id. at 37-38.)  He also testified that he had not suffered a seizure since January 8, 2011.  (Id.)  Wiemers said that his seizures occurred without warning and that they lasted approximately three and one-half to five minutes.  (Id. at 28.  But see id. at 36 (indicating that excitement or anxiety can trigger seizures).)  On the day after a seizure, he felt soreness all over his

_____

[4] Evidently, Wiemers was driving despite the recent seizure.

[5] This is in conflict with the record from Wiemers' hospital visit following his arrest, which indicates that Wiemers reported suffering a seizure on January 8, 2011.  (See Tr. at 543.)

17

body and had difficulty comprehending things.  (Id. at 28-29.)  He also experienced exhaustion for two to five days and headaches for "a couple of days at least" after a seizure.  (Id. at 29-30.)  He took dilantin for his seizures, but "sometimes it works and sometimes it doesn't."  (Id. at 40-41.)  Wiemers testified that he had not been driving since he "wrecked" his car.  (Id. at 30-31.)  He also said that he was able to take care of his personal grooming needs and wash dishes, vacuum, and make the bed before "run[ning] out of energy."  (Id. at 31.)

Wiemers testified that his anxiety could "come on at any time" and caused him to "get really nervous."  (Id. at 31-32.)  He said that he took Serax for anxiety, (id. at 40), but he gave conflicting testimony about its effectiveness, (compare id. at 32 ("I don't think it does me any good.  Now Christy, my wife, says . . . [it] affects me . . . .") with id. at 34 ("Since I've been on the Serax, it's been a lot better . . . .  There's just sometimes the medication doesn't work.  Most of the time it settles me down.")). He also said that he was reluctant to leave his residence, especially without his wife. (Id. at 33-35.)

Wiemers also testified that his shoulder ached when the weather changed, when he slept on the shoulder, or when he over-exerted himself.  (Id. at 35-36.)

### C.    Evidence Submitted Following the Hearing

On April 28, 2011, Wiemers' attorney submitted to the Commissioner "Mental Residual Functional Capacity Assessment" and "Psychiatric Review Technique" forms that had been completed by Stanley R. Carlock, Ed.D.  (See id. at 612-630.) On the Mental Residual Functional Capacity Assessment form, Dr. Carlock indicated that Wiemers was "Markedly Limited" in thirteen different functional areas, (e.g., "The ability to understand and remember detailed instructions"; "The ability to maintain attention and concentration for extended periods"), and that he was

18

"Moderately Limited" in three additional functional areas, (e.g., "The ability to make simple work-related decisions"). (Id. at 613-614.)   On the Psychiatric Review Technique form, Dr. Carlock indicated that Wiemers had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Id. at 627.) He also noted, "This pt is not entirely familiar to me [and] conclusions are based on documentation from pt's history [and] psychological test results." (Id. at 629.)

On or about April 27, 2011, the ALJ obtained answers to interrogatories that had been submitted to a Vocational Expert (VE).  (See id. at 234-244.)  The ALJ asked the VE to assume that Wiemers has "the following residual functional capacity: [he] is limited to light work with the following additional restrictions: He is limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling.  He should avoid concentrated exposure to extreme cold or heat, vibrations, fumes or hazardous conditions.   He is limited to simple work involving occasional interpersonal contact." (Id. at 242.) The ALJ then asked whether, given this residual functional capacity and Wiemer's age, education, and work experience, Wiemers could perform any of his past work. (Id.) The VE responded negatively. (Id.) The ALJ also asked the VE whether Wiemers was able to "perform any jobs in the National Economy." (Id.) The VE responded affirmatively and indicated that Wiemers could perform light unskilled work as a price marker or electrical assembler or sedentary unskilled work as a wire wrapper or production checker. (Id.)

### D.   The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled.  See 20 C.F.R. § 404.1520(a); id. § 416.920(a).  The ALJ must continue the analysis until the claimant is found to be "not disabled" at

steps one, two, four or five, or is found to be "disabled" at step three or step five.  See 20 C.F.R. § 404.1520(a); id. § 416.920(a)  In this case, the ALJ proceeded to step five and found Wiemers to be not disabled.  (See Tr. at 12-21.)

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.  See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b).  In the instant case, the ALJ found that Wiemers "has not engaged in substantial gainful activity since March 1, 2009, the amended alleged onset date."  (Tr. at 12 (citation omitted).)

Step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 404.1520(c); id. § 416.920(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement."  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."); id. § 416.920(a)(4)(ii), (c); id. § 416.909.  Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b); id. § 416.921(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 416.920(a)(4)(ii), (c).  Here, the ALJ found that Wiemers

20

"has the following severe impairments: seizure disorder and an affective disorder variously diagnosed as bipolar and/or dysthymic disorder."  (Tr. at 12 (citation omitted).)

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii); see also 20 C.F.R. Part 404, Subpart P, App'x 1.  If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled."  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii).  If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.  See 20 C.F.R. § 404.1520(a); id. § 416.920(a).  The ALJ found that Wiemers "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (Tr. at 13 (citations omitted).)

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[6] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work."  See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f); id. § 416.920(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv), (f); id. § 416.920(a)(4)(iv), (f).  The ALJ concluded that Wiemers "has the residual functional capacity to perform light work as defined in 20 CFR

_____

[6] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments."  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).  See also 20 C.F.R. § 416.945(a).

404.1567(b) and 416.967(b), in that the claimant can lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours out of an eight-hour workday; and sit for six hours out of an eight-hour workday.  The claimant can occasionally climb, balance, stoop, kneel, crouch and crawl, but he should avoid concentrated exposure to extreme cold or heat, vibrations, fumes and hazardous conditions.  Further, the claimant is limited to simple work involving occasional interpersonal contact."  (Tr. at 14.)  The ALJ added, "The claimant is unable to perform any past relevant work."  (Id. at 19 (citations omitted).)

Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past.  See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g).  If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five.  See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g).  The ALJ wrote, "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."  (Tr. at 20.)  Specifically, Wiemers "would be able to perform the requirements of representative occupations such as: price marker . . . ; electrical assembler . . . ; wire wrapper . . .; and production checker . . . ."  (Id. at 20.)  The ALJ concluded, therefore, that Wiemers was not under a disability between March 1, 2009, and the date of the decision.  (Id. at 21.)

### III.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings."

Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion."  Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error."  Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000).  No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

## IV.   ANALYSIS

Wiemers argues that the Commissioner's decision must be reversed because 1) the ALJ failed to give good reasons for rejecting the opinions of Nurse Bock, and 2) the ALJ did not properly assess Wiemers' credibility.  (Pl.'s Br. at 8-9, ECF No. 17.)  I shall analyze each of his arguments in turn.

23

## A.   Whether the ALJ Failed to Give Good Reasons for Discounting Nurse Bock's pinions

Wiemers argues first that the ALJ erred by failing to give sufficient weight to the opinions expressed by Nurse Bock on the Seizures Residual Functional Capacity Questionnaire dated December 22, 2009.  (See Pl.'s Br. at 10-14, ECF No. 17; Pl.'s Reply Br. at 1-4, ECF No. 21.)

"The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  See also 20 C.F.R. § 404.1545; id. § 416.945.  Nevertheless, "[b]ecause a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)).

Evidence from an "acceptable medical source" is needed to establish whether a claimant has any medically determinable impairments, and Nurse Bock is not an acceptable medical source within the meaning of the Social Security regulations.  See 20 C.F.R. § 404.1513(a), (d)(1); id. § 416.913(a), (d)(1).    Nevertheless, she is an "other" medical source, and the Commissioner may consider her opinions about "the severity of [Wiemers'] impairment[s] and how they affect[] [his] ability to work."  See 20 C.F.R. § 404.1513(d); id. § 416.913(d).  When weighing the opinions of medical sources who are not "acceptable medical sources," the Commissioner may consider the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c).  See SSR 06-03p, 71 Fed. Reg. 45593-03, 2006 WL 2329939, at *4 (Aug. 9, 2006).  These factors include the length of the treatment relationship, the frequency of the source's visits

with the claimant, the consistency between the source's opinions and other evidence, the degree to which the source presents relevant evidence to support the opinion, the quality of the source's explanation for the opinion, whether the opinion falls within the source's specialty or area of expertise, and any other factor that may support or refute the opinion.  See id. at *4-5.

The ALJ's decision includes the following discussion of the opinions expressed by Nurse Bock on the Seizures Residual Functional Capacity Questionnaire:

> In December 2009, Dr. Bock opined that the claimant has "good response" to his seizure medication, but his seizures disrupt his activities of daily living, are likely to disrupt the work of co-workers, he needs more supervision at work, and he is unable to work at heights, with power machines or operate a motor vehicle.  Dr. Bock also opined that the claimant needs to take unscheduled breaks every two hours for ten minutes, is incapable of handling even low stress jobs, and will miss work more than four days a month.  Despite Dr. Bock's treating relationship with the claimant, I do not give her opinion controlling weight, but instead give it some weight because the medical record does reflect that the claimant has "good response" to his seizure medication when he takes it as prescribed.  Dr. Bock's opinion is not consistent with her subsequent treating notes that state the claimant "gets good relief" from pain with Tramadol and that Lyrica helps with general pain in January 2010.  Further, Dr. Bock's opinion is inconsistent with the opinion of Patricia J. Blake, Ph.D., who opined that the claimant does not have any restrictions in activities of daily living, is able to carry out short and simple instructions under ordinary supervision, and is able to adapt to changes in the environment.  Dr. Bock's opinion is also inconsistent with the subsequent statements of the claimant and his wife that he "believes the medications are working," his "wife can tell a difference when patient has not taken his medications," and that he "denies problems."

25

(Tr. at 16 (citations omitted).)[7]

Wiemers argues that the ALJ committed several errors when analyzing Nurse Bock's opinions.  First, he states,

> The ALJ's reference to "good response" was found in Ms. Bock's response to question 18 [on the Seizure Residual Functional Capacity Questionnaire].  "Type of medication and response: Lorazepam - good response."  However, other records show that Plaintiff was taking Lorazepam for "anxiety." . . .  So this notation of "good response" by Ms. Bock . . . was referring to his response to his anxiety medication, not his seizure medication, as suggested by the ALJ.  The record shows that Plaintiff's medication for his seizures was Dilantin.

(Pl.'s Br. at 12, ECF No 17 (citations omitted).)  I agree that Wiemers was prescribed Dilantin for seizures and Lorazepam for anxiety, and the ALJ erred by referring to Lorazepam as a "seizure medication."  (Tr. at 16.)  The ALJ's error is harmless, however.  Indeed, because the ALJ considered Nurse Bock's statement about the effectiveness of Lorazepam to be a reason for <u>crediting</u> her opinions, his error worked to Wiemers' benefit.[8]

Wiemers also argues,

---

[7] The ALJ referred to Nurse Bock as "Janet Bock, M.D.," (Tr. at 16), and evidently believed that she was an "acceptable medical source" whose opinions were eligible to be given "controlling weight," <u>e.g.</u>, 20 C.F.R. § 404.1527(c)(2) (stating that the Commissioner will give a treating source's opinion about the nature and severity of a claimant's impairment "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record").  This error did not work to Wiemers' detriment, however, and I find that it was harmless.

[8] I note in passing that the ALJ's error is quite understandable given Nurse Bock's reference to Lorazepam on the Questionnaire.  (<u>See</u> Tr. at 433.)

26

Next, the ALJ asserts that Dr. Bock's opinion is not consistent with her subsequent treating notes that state the claimant "gets good relief" from pain with Tramadol and that Lyrica helps with general pain in January 2010. Ms. Bock's opinions on the questionnaire were primarily related to the Plaintiff's seizures. Whether or not Plaintiff had good relief from medications for his pain was irrelevant to Ms. Bock's opinions relating to his seizure disorder. The ALJ has failed to give a good reason for giving little weight to the opinion of Ms. Bock.

(Pl.'s Br. at 12, ECF No. 17 (citation omitted).) It is true that the Questionnaire is "primarily related" to Wiemers' seizures. However, the Questionnaire also asks about the patient's "associated mental problems," (Tr. at 434), and diagnoses, (id. at 432). In response to these questions, Nurse Bock wrote that Wiemers' "associated mental problem[]" was "extreme anxiety" and that his diagnoses included hypertension, bipolar disorder, history of alcoholism, chronic neck and back pain, history of anemia, insomnia, and anxiety. (Id. at 432, 434.) In addition, the Questionnaire includes the following item:

> 33. Please describe any other limitations (such as limitations in the ability to sit, stand, walk, lift, bend, stoop, limitations in using arms, hands, fingers, limited vision, difficulty hearing, need to avoid temperature extremes, wetness, humidity, noise, dust, fumes, gases, or hazards, etc.) that would affect your patient's ability to work at a regular job on a sustained basis:

(Id. at 435.) Responding to this question, Nurse Bock wrote, "Chronic neck pain [and] back pain. Frequent headaches." (Id.) Thus, it is reasonable to infer that Nurse Bock's opinions about Wiemers' need for breaks and likely absences from work are based in part upon her view that Wiemers suffers from chronic pain. Under the circumstances, it was proper for the ALJ to note that Nurse Bock's opinion is inconsistent with medical records indicating that Wiemers gets "good relief" from his pain medication.

27

Wiemers also argues that the ALJ erred by using Dr. Blake's opinions to discredit Nurse Bock's opinions. He states,

> The limitations noted in Dr. Blake's report are limitations concerning Plaintiff's mental condition, while the opinions expressed by Ms. Bock concerned his physical condition. The ALJ is comparing apples and oranges here. The ALJ's assertion that Plaintiff's mental condition as assessed by Dr. Blake is inconsistent with Plaintiff's physical condition as assessed by Ms. Bock . . . is absurd. The two opinions are assessing completely different subject matters. There is no reason why there should be consistency between the two opinions, as they are assessments of total [sic] different subjects.

(Pl.'s Br. at 12-13, ECF No. 17.) Wiemers' argument is not persuasive. It is fair to say that Dr. Blake's report focuses on "mental health issues" (i.e., anxiety and bipolar disorder), although it does include references to Wiemers' seizures on every page. (See Tr. at 378-381.) As I noted above, however, Nurse Bock's opinions about Wiemers' ability to work are based in part upon her assessment of his "associated mental problems." (See, e.g., Tr. at 434-35 (wherein Nurse Bock indicates that Wiemers' anxiety is an "associated mental problem" and that he is "[i]ncapable of even 'low stress' jobs" due to his anxiety).) Indeed, Nurse Bock appears to believe that Lorazepam (which, as Wiemers correctly notes, was prescribed to treat anxiety) is the medication that most effectively controls Wiemers' seizure disorder. (See id. at 433.)[9] In short, there is a significant discrepancy between the opinions of Nurse Bock and Dr. Blake regarding the effects of Wiemers' anxiety on his ability to work,

---

[9] I note in passing that Wiemers undermines his argument that Nurse Bock's Questionnaire is unrelated to his "mental condition" when he claims that Nurse Bock "was referring to [Wiemers'] response to his anxiety medication, not his seizure medication," when discussing Lorazepam. (See Pl.'s Br. at 12-13, ECF No. 17. See also Pl.'s Reply Br. at 4, ECF No. 21.)

and I find that it was appropriate for the ALJ to note this discrepancy when assigning weight to Nurse Bock's opinions.

Finally, Wiemers argues that the ALJ erred by citing inconsistencies between Nurse Bock's opinions and certain statements made by Wiemers and his wife. Once again, Wiemers claims that "the opinion of Dr. [sic] Bock is in reference to Plaintiff's seizures, while the statements of Plaintiff and his wife are in reference to his mental condition," which are "totally separate subjects." (Pl.'s Br. at 13, ECF No. 17.) As I explained above, Nurse Bock did not treat Wiemers' seizures and anxiety as "totally separate subjects," and her opinions about Wiemers' ability to work are based in part on her assessment of his anxiety disorder. It was therefore proper for the ALJ to consider statements about the effectiveness of Wiemers' anxiety treatment when assigning weight to Nurse Bock's opinions.[10]

In summary, although Nurse Bock's opinions that Wiemers must take breaks every two hours, that he cannot perform "even 'low stress' jobs" due to anxiety, and that he will miss work "[m]ore than four days per month" appear on a "Seizure Residual Functional Capacity Questionnaire," these opinions are based largely on Nurse Bock's assessment of Wiemers' pain and anxiety. (See Tr. at 435.) Indeed, given Nurse Bock's acknowledgment that Wiemers's seizures occur infrequently, (id. at 432), it is difficult to see how the aforementioned opinions could be based on the effects of Wiemers' seizures. It was appropriate for the ALJ to discredit these

---

[10] Wiemers also states that he is "unable to find a reference in Exhibit 22F where Plaintiff . . . 'denies problems.'" (Pl.'s Br. at 13, ECF No. 17.) I note that Dr. Duffy's treatment record dated September 20, 2010, states, "Taking medications regularly and denies problems." (Tr. at 564.) Similarly, Dr. Duffy's treatment record dated January 19, 2011, states, "Patient states he has been taking his medications regularly and denies problems." (Id. at 591.)

opinions by citing evidence showing that Wiemers' pain and anxiety did not cause such significant limitations, and the case will not be remanded on the ground that the ALJ failed to give good reasons for giving reduced weight to the opinions.

### B.   Whether the ALJ Properly Assessed Wiemers' Credibility

Wiemers also argues that the ALJ erred by discrediting his testimony. (Pl.'s Br. at 14-23, ECF No. 17.)

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)). "In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the participating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Id. (citing, inter alia, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." Id. (citation omitted) (alteration in original). The ALJ need not explicitly discuss each of the foregoing factors, however. Id. (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)). "It is sufficient if [the ALJ] acknowledges and considers [the] factors before discounting a claimant's subjective complaints." Id. (quoting Goff, 421 F.3d at 791) (alteration in original). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so," courts "will normally defer to the ALJ's credibility determination." Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010)).

The ALJ wrote,

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally not fully credible. As stated above, the claimant alleges he is unable to work. However, the record establishes that the claimant is capable of working. The claimant is able to engage in a full range of activities of daily living that could translate into performing a job including cooking and housecleaning. Further, the claimant's work record draws into question the claimant's motivation to work.

Regarding the claimants [sic] asserted medical conditions, the medical record does evidence that the claimant has seizure disorder and an affective disorder variously diagnosed as bipolar and/or dysthymic disorder. However, there is insufficient medical evidence in the record to support the level of limitation alleged by the claimant. On the contrary, the record reveals that the claimant does well with his impairments when he takes his medication properly. For example, in December 2009, Dr. Bock found that the claimant has a "good response" to his seizure medication and in January 2010, she noted that the claimant "gets good relief" from pain with Tramadol and the claimant reported that Lyrica has helped with general pain and he denied any seizure activity. Further, Dr. Duffy found that the claimant's bipolar disorder was only "moderate" and the only treatment he receives is medication. The claimant also testified that since he has been taking medication his psychological issues have "been a lot better" and "most of the time" his medication settles him down. Additional statements from the claimant and his wife reveal that this impairments [sic] are under control, including he is "more mellow on medication," he "believes the medications are working," his "wife can tell a difference when patient has not taken his medications," and in January 2011 he "Denie[d] problems." There is also insufficient evidence in the medical record that the claimants [sic] alleged allergies impair his ability to perform basic work activities beyond the residual functional capacity as listed above or are medically determinable. Lastly, the claimant's

history of right shoulder surgery, history of cervical microdiscectomy, headaches, hypertension, chronic back pain, fatigue, bleeding ulcers and anxiety were determined to be non-severe.

The undersigned also notes that the claimant has been non-compliant with his medical treatment in that he has not taken medication as prescribed including being found with a "subtherapeutic Dilantin level" in January 2010. This indicates that the claimant may not believe that his condition is as serious as alleged. Additionally, the claimant testified that since March 2009, he has one to two grand mal seizures a month, but when asked about his recent seizures he testified that he had seizures in August, October and December 2010 and that his most recent seizure was on January 8, 2011. Subsequently, the claimant testified that these are just the seizures recorded by his wife and he has had other seizures, but does not know the dates. These inconsistent statements about the frequency of his seizures as well as his non-compliance do not bolster the claimant's credibility.

(Tr. at 18-19 (citations omitted).)

As I will discuss below, certain aspects of the ALJ's analysis are flawed. Overall, however, I find that the ALJ has given good reasons for discrediting Wiemers' testimony to the extent that it is inconsistent with the RFC finding, and therefore the ALJ's credibility determination merits deference.

Wiemers raises a number of specific objections to the ALJ's credibility determination. First, Wiemers argues that the ALJ erred by finding that Wiemers' daily activities "could translate into performing a job including cooking and housecleaning." (Pl.'s Br. at 15-16, ECF No. 17 (citing Reed v. Barnhart, 399 F.3d 917, 922 (8th Cir. 2005)). See also Tr. at 18.) I agree. It is proper for an ALJ to consider whether a claimant's daily activities are consistent with his allegations of disability. See, e.g., Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012) ("We have held that acts which are inconsistent with a claimant's assertion of disability

reflect negatively upon that claimant's credibility." (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010))); Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009). But it is another matter to conclude, as the ALJ did here, that evidence of day-to-day cooking and housecleaning activities indicates that the claimant is capable of performing full-time competitive work as a cook or housecleaner. See Reed v. Barnhart, 399 F.3d 917, 923-924 (8th Cir. 2005). Indeed, the Commissioner concedes that "the extent of [Wiemers'] daily activities was not conclusive evidence of [his] ability to work full-time." (Def.'s Br. at 23, ECF No. 20.) In short, I find that although it would have been appropriate for the ALJ to cite inconsistencies between Wiemers' allegations of total disability and his daily activities as a reason for discrediting his testimony, the ALJ erred by concluding that Wiemers' daily cooking and cleaning activities "could translate into performing a job including cooking and housecleaning." Wiemers argues next that the ALJ erred by concluding that Wiemers' work record "draws into question [his] motivation to work." (Pl.'s Br. at 16-17, ECF No 17 (citing Cox v. Barnhart, 345 F.3d 606, 611 (8th Cir. 2003)).) I disagree. It was appropriate for the ALJ to note that Wiemers's work record, which includes several years of very low earnings before the alleged onset of disability, raises questions about Wiemers' motivation. (See, e.g., Tr. at 130.) I find it significant that the ALJ did not discredit Wiemers based solely on his doubts about Wiemers' motivation, but instead merely cited this factor as one among many that called Wiemers' credibility into doubt. See, e.g., Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996). This case is therefore unlike Cox, wherein an ALJ improperly discredited testimony that was consistent with the medical record merely because the claimant's work history consisted of "low income jobs and unexplained employment gaps." 345 F.3d at 611.

Next, Wiemers argues that the ALJ improperly concluded that the medical record did not "support the level of limitation alleged by the claimant." (Pl.'s Br. at 17-18, ECF No. 17.)  In support of this argument, Wiemers notes that the ALJ once again mistakenly considered Lorazepam to be a "seizure medication," and he suggests that the ALJ over-emphasized Wiemers' denial of seizure activity during a visit with Nurse Bock.  (See id.)  I find, however, that the record includes substantial evidence showing that Wiemers' medications were effective when they were taken as prescribed, and this conclusion is not undermined by the confusion (created by Nurse Bock) about whether Lorazepam constituted a "seizure medication."[11]  Also, the ALJ did not err by noting that Wiemers denied seizure activity during visits with Nurse Bock on September 2, 2009, and January 19, 2010.  (See Tr. at 18 (citing, inter alia, Ex. 19F, p. 28 (i.e., Tr. at 537)).)

Wiemers objects to the ALJ's observation that "Dr. Duffy found that the claimant's bipolar disorder was only 'moderate' and the only treatment he receives is medication."  (Pl.'s Br. at 18, ECF No. 17 (quoting Tr. at 18-19).)  Although Wiemers concedes that Dr. Duffy's diagnosis was "Bipolar I, moderate," he argues that Dr. Duffy's mental status examination and GAF scores "show[] that Plaintiff's condition would have a significant negative impact on his ability to perform productive employment."  (Id.)  He also argues that because Dr. Duffy ordered psychological testing in the "treatment plan," "the ALJ is incorrect that the only treatment Plaintiff receives is medication."  (Id.)  Both arguments are unpersuasive. As to the first, the ALJ did not find that Wiemers' bipolar disorder would have no "significant negative impact on his ability to perform productive employment";

---

[11] Wiemers' own testimony about the effectiveness of his medication will be discussed below.

rather, the ALJ found that Wiemers' impairments limited him to a subset of light work and that Wiemers' allegations of total disability were not credible. Also, the ALJ did not err by noting that Dr. Duffy diagnosed Wiemers with "moderate" bipolar disorder.[12]   Furthermore, Dr. Duffy's records state clearly that Wiemers was not referred for psychotherapy, nor was he referred to "school, work, or community assistance." (E.g., Tr. at 562.)  Although it is true that Wiemers was ordered to undergo psychological testing, the records clearly demonstrate that this testing did not constitute psychological treatment.  Thus, the ALJ did not err by observing that Wiemers was not treated with anything other than medication.

Next, Wiemers denies testifying that his psychological issues have "been a lot better" since he began taking his medication and that his medication settles him down "most of the time." (Pl.'s Br. at 18-19, ECF No. 17.)  As I noted above in Part II.B, Wiemers did indeed testify that "[s]ince [he has] been on the Serax, it's been a lot better," and "[m]ost of the time it settles [him] down." (See Tr. at 34.)  The ALJ did not err by noting this testimony, nor did he err by citing other evidence in the record demonstrating that Wiemers and his wife both acknowledged the effectiveness of the medication.

Wiemers implies that it was improper for the ALJ to mention that a number of Wiemers' alleged impairments were non-severe.  As I explained previously, the ALJ must consider "any functional restrictions" when assessing a claimant's credibility. E.g., Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009).  It was appropriate for the ALJ to note that Wiemers' "history of right shoulder surgery, history of cervical

---

[12] To the extent that Wiemers argues that the record does not contain substantial evidence supporting the conclusion that his bipolar disorder is "moderate," his argument is rejected.

microdiscectomy, headaches, hypertension, chronic back pain, fatigue, bleeding ulcers and anxiety were determined to be non-severe." (Tr. at 19.)

Wiemers argues that the ALJ erred by discrediting him based on the discrepancies in his testimony about the frequency of his seizures. (Pl.'s Br. at 23, ECF No. 17.) I disagree. Wiemers' testimony that he suffers one or two grand mal seizures per month contradicts his own personal records, his own testimony, and the record as a whole. It is true that Wiemers attempted to explain the discrepancy between his testimony and his personal records by claiming that he only documented the seizures that were witnessed by his wife. The fact remains, however, that he was unable to provide any dates or details to corroborate his claim that he suffered one or two seizures per month. (See Tr. at 36-40.) On the contrary, he testified that he suffered no seizures between January 8, 2011, and March 1, 2011, which flatly undermines his prior testimony about the frequency of his seizures.

Wiemers also disputes the ALJ's finding that Wiemers' non-compliance with his medical treatment undermined his credibility. (Pl.'s Br. at 20-22, ECF No. 17.) First, Wiemers argues that his "subtherapeutic Dilantin level" was caused by nausea, not non-compliance. (Id. at 20.) More specifically, he states "While there is a record of a subtherapeutic Dilantin level, the same record also notes, 'Admits to missing "some" phenytoin (secondary to nausea).' This additional note . . . explains that Plaintiff missed some medication due to nausea, rather than due to non-compliance, as asserted by the ALJ." (Id.) He adds, "It should also be noted that Janet Bock, APRN, the medical source treating [Wiemers'] seizures[,] indicated that Plaintiff was compliant with taking medications." (Id.) I take Wiemers' argument to be that because he admitted to missing some phenytoin doses due to nausea, the ALJ should have inferred that the subtherapeutic levels of a different medication were also due

to nausea.  While I agree that it is possible to draw this inference, the record does not compel it.    Therefore,  I  cannot  say  that  the  ALJ  erred  by  citing  Wiemers'  subtherapeutic Dilantin level as evidence of non-compliance.

Second, Wiemers argues that his credibility is not undermined by the fact that he repeatedly exceeded his prescribed dose of Serax.  More specifically, he states that the records do not "support the ALJ's assertion that the claimant may not believe that his condition is as serious as alleged"; rather, they "most likely suggest[] that the medication was not working, so Plaintiff took extra in hopes that more medication would help him cope with his symptoms."  (Pl.'s Br. at 20-21, ECF No. 17.)  Once again, I agree with Wiemers that his view of the evidence is reasonable.[13]  It is also permissible,  however,  to  conclude  that  Wiemers  had  no  good  reason  for  failing  to comply with his doctors' instructions, which casts doubt on the credibility of his testimony (especially insofar as it concerns the effectiveness of his medication).  Cf. McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) ("If substantial evidence supports the decision, then we may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if we may have reached a different outcome." (emphasis added).)

Third, and finally, Wiemers argues that the ALJ's failed to comply with 20 C.F.R. § 404.1530, 20 C.F.R. § 416.930, and SSR 82-59 when determining that Wiemers was "non-compliant" with his prescribed treatment.  (Pl.'s Br. at 21-22, ECF

---

[13] I note in passing, however, that on October 27, 2010, Wiemers reported that "he feels great on his medication and has a good appetite when he's taking meds," and he "admit[ted] to taking more than he's prescribed when he doesn't give them to his wife."  (Tr. at 570.)  This record undermines Wiemers' argument that he took extra medication because it was not working.  (Pl.'s Br. at 21, ECF No. 17.)

No. 17.)  These regulations state that an unjustified failure to follow prescribed treatment is grounds for denying a claim, and SSR 82-59 states that an individual who would otherwise be found "disabled" can be found to be "not disabled" based on an unjustified failure to follow prescribed treatment.  In the instant case, the ALJ did not base his conclusion that Wiemers was "not disabled" on Wiemers' failure to comply with his prescribed treatment; rather, he considered Wiemers' noncompliance as a factor that undermined the credibility of his testimony.  This was proper.  See, e.g., Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006).  Section 404.1530, section 416.930, and SSR 82-59 are simply not applicable here.

In summary, although the ALJ's credibility analysis is not completely free of error, I find that the ALJ provided several good reasons for concluding that Wiemers was not fully credible.

**IT IS ORDERED** that the Commissioner of Social Security's decision is affirmed.

Dated March 6, 2013.

BY THE COURT

Warren K. Urbom
United States Senior District Judge

38